[No. 2807.]

## D. Cartwright and J. Nash *v.* The State.

1. Homicide, Excusable or Justifiable—Right of Self-Defense.—Because the slayer by his own wrongful acts produced a necessity to take the life of the deceased in order to preserve his own, it does not always follow that the homicide cannot be justified or excused. Consideration must be addressed to the nature and quality of the wrongful acts by which it is claimed the right of self-defense is forfeited or abridged.

2. Same.—Adjudicated cases hold that among the slayer's acts which abrogate or abridge his right of self-defense are the following: 1. Devices by language or otherwise to provoke the deceased to make an assault which will furnish a pretext for taking his life or inflicting serious bodily injury upon him. 2. Provocation of the deceased into a quarrel, causing the fatal affray; but mere words or libelous publications do not amount to such provocation. 3. Preconcert with the deceased to fight him with deadly weapons. 4. Commencing an attack, assault, or battery upon the deceased. 5. Going with a deadly weapon to where the deceased is, for the purpose of provoking a difficulty or bringing on an affray, and by words or acts making some demonstration of such purpose calculated to provoke the deceased.

3. Same.—The right of self-defense is not impaired by mere preparation for the perpetration of a wrongful act, unheralded and unaccompanied by any demonstration, verbal or otherwise, indicative of the wrongful purpose.

4. Same.—Case Stated—Charge of the Court.— At the trial of C. and N. for murder, the inculpatory proof showed that C. undertook to execute a writ for the seizure of a gun in the possession of the deceased, and procured the assistance of N., neither of them being an officer. Deceased having left the immediate vicinity, they pursued him and overtook a wagon in which he was seated with the gun in his hands. C., with a pistol in hand, called for the wagon to stop, and shots were immediately exchanged between the defendants and the deceased, and the latter was

killed. For the defense it was in proof that the first shot was fired by the deceased. The trial court in effect instructed the jury that the plenary right of self-defense was not available to the defendants in justification or excuse of the homicide. *Held*, error. See the opinion *in extenso* for a full exposition of the ruling.

APPEAL from the District Court of Bastrop. Tried below before the Hon. L. W. Moore.

At the spring term, 1881, of the District Court of Bastrop county the grand jury returned an indictment charging that the appellants, Dave Cartwright and John Nash, did, on the preceding twelfth day of February, kill and murder one B. F. Davis, by shooting him with pistols, etc. The case came to trial in May, 1883, when the appellants were found guilty of murder in the second degree, and a term of six years in the penitentiary was assessed and adjudged against each of them.

The affray which resulted in the homicide took place four or five miles from the town of McDade, on the road leading from there to the town of Bastrop.

William Paris, the first witness for the State, testified that on the twelfth day of February, 1881, he saw Davis, the deceased, about half a mile from McDade on the road towards Bastrop. Witness was driving a four-mule wagon, and was riding the left-hand near mule of the team. Deceased got into the wagon, and seated himself about midway of it, with his right side towards the witness. He had a breech loading double barreled shot gun on his lap, or in his hands, with the muzzle pointing towards McDade; and in this manner he rode about three miles on witness's wagon. While going along, the deceased showed his cartridge belt and several cartridges to the witness. The cartridge shells were loaded. Witness, with his wagon and the deceased, had gone about the distance stated, and had got within about one hundred yards of James Townsend's house, when the defendants, Dave Cartwright and John Nash, rode up in a gallop from the direction of McDade. Cartwright rode up on the right hand side of the wagon; Nash in rear of it. Cartwright said "Hold up there;" he had a pistol in his hand. Witness then looked around to stop his mules, and the shooting commenced. Looking around, the witness saw Cartwright shoot once. There had been shots before he looked around and saw Cartwright shoot. Before the shooting began the witness had observed Kelton (a witness for the defense) working at a chimney on the east

end of Townsend's house. Several shots were fired behind the witness. He did not see Nash until after the firing had ceased. Nash then had a pistol in his hand. Witness thought there were from three to five shots fired, probably more. Two of them struck the end of the wagon bed; one went through the witness's clothing, and another hit one of his mules, entering the hind part of its leg and coming out in front. Witness saw blood on the clothes of the deceased, but did not see his wounds.

Cross-examined, the witness stated that after the firing ceased Cartwright told him to take the gun from the deceased, who was rather bent over in the wagon. Witness took the gun from the deceased, and laid it on the ground. Deceased was still alive, but said nothing. The witness distinguished no difference in the sounds of the different shots; but on hearing read his sworn statement made at the inquest held the day after the killing, the witness adhered to it in preference to his present recollection. In that statement the witness had said that he did not know whether the deceased fired any of the shots or not; that he did not see the deceased shoot, "but there were sounds that seemed different shots from the pistols."

Aleck White, for the State, testified that he saw the deceased in Paris's wagon, on the McDade road, about a mile from James Townsend's, between two and three o'clock in the afternoon. When witness got in about a quarter of a mile of Townsend's, he was passed by the two defendants, who were riding in a slow lope towards the town of Bastrop. Witness saw them when they were a short distance behind Paris's wagon. The witness heard three or four shots, but was so frightened that he did not see who fired them.

Doctor Holt, for the State, testified that he examined the body of the deceased a day or two after the homicide, and found in it two holes, which he took to be bullet holes made by a revolver or six shooter. One of the bullets entered just below the right shoulder blade and came out through the right nipple. The other bullet entered on the right of the back bone, three or four inches below the one first mentioned, and came out below the right nipple.

Tom Bishop, for the State, testified that he was constable of the McDade precinct at the time the deceased was killed. On the day that event occurred, the witness was requested by Horace Nash to execute a writ of sequestration which, at his instance, was being issued by the justice of the peace, for the

seizure of the gun of B. F. Davis, the deceased. Witness replied that he was too unwell to execute the writ, and asked the defendant Cartwright to execute it. Cartwright had been in the habit of executing process for the witness when the latter was unable to attend to business.

W. H. Coulson, Sr., the justice of the peace, testified, for the defense, that on the day of the homicide he, at the instance of Horace Nash, issued a writ of sequestration directing the seizure of the gun which Davis, the deceased, then had. While the writ of sequestration was being prepared, Horace Nash and the defendant Cartwright were present in the witness's office. When the writ was issued the witness laid it on the table, and either Nash or Cartwright took it up from the table, and they went off together. Witness supposed that it was Cartwright who picked up the writ from the table. Cartwright had frequently executed process issued by the witness, and attended as an officer upon the witness's court. Witness could not say how many writs Cartwright had executed, nor how many arrests he had made, but knew that he had executed several writs, and that the people of McDade, as well as witness, regarded him as an officer. Witness had never specially deputized Cartwright.

Horace Nash, for the defense, testified that Davis, the deceased, on the day he was killed, pledged his gun to witness for a loan of sixty dollars, but took the gun away from where it had been left, and refused either to give it up to witness or to repay him the money. Witness went to Bishop, the constable, and asked him to execute a writ of sequestration, which was being prepared for the seizure of the gun. The constable said he was too sick to attend to business, and asked witness to see the defendant Cartwright. The constable and witness saw Cartwright, and the latter went with witness to the office of Coulson, the justice of the peace, when the writ of sequestration was issued by Coulson for the gun. Cartwright took the writ, and as he was starting off with it, he summoned the defendant John Nash to go with him, and they two went off on their horses together. The witness at that time regarded Cartwright as an officer.

On his cross-examination, the witness stated that he demanded of the deceased the payment of the money, or, else, the possession of the gun which he had pledged to witness as security for the money. Witness told the deceased that if he did not deliver up the gun he would kill him, and at that time the witness held

in his hand a gun of the defendant John Nash, but he made no attempt to use it. Neither of the defendants were present when witness told the deceased he would kill him if he did not deliver up the gun. When witness and the deceased separated, the latter went to the hotel and got the gun, and the former went to the justice of the peace to get a writ of sequestration for the gun. The gun had never been put absolutely in witness's possession, but it was understood between him and the deceased that it should remain at the hotel and stand good for the money witness had loaned the deceased. John Nash, one of the defendants, is witness's nephew.

W. R. Kelton, for the defense, testified that he was standing on a scaffold about breast high, and was engaged in putting up a chimney at the east end of Townsend's house, which was some fifty yards from where the shooting took place. Witness first heard one of the parties on horseback say either "hold up" or "do not shoot." Which of these expressions was used he could not remember. At the same moment he saw the deceased, in Paris's wagon, with a shot gun elevated, and saw him shoot twice. The first shot was directed towards the man in rear of the wagon, and the second towards the man on the right of the wagon. Then the witness heard other shots, and judged them to be from pistols, as these reports were different from those of the two shots first fired. Witness was certain that the deceased fired two shots first, and that no shots were fired before them. From where the witness stood upon the scaffold he could see the deceased plainly; and he saw Paris take the gun out of the wagon after the firing. Witness immediately went to where the firing took place. He examined the gun, but did not take the shells out of it. He saw that the shells had been freshly exploded or snapped. In all, there must have been five, six, or seven shots fired. Witness, however, saw no other person shoot besides the deceased.

J. H. Tanner, for the defense, testified that his attention was first called by hearing two shots, which, at the moment, he supposed were fired by an old negro who was in the habit of hunting with a shot gun in the neighborhood. Directly, however, other shots were fired, and witness immediately went down to where they were fired. The deceased was humped over in the wagon. Witness saw Mr. Paris take up a shot gun as witness approached the wagon. Witness took hold of the gun. It appeared to have been freshly fired off. Witness examined it, and saw that the

cartridges had been fired or snapped. Defendant Cartwright told the witness not to let anyone take the cartridges out of the gun. Some time in the course of the next day the witness and several others examined the gun, and in it found two empty shells, one in each barrel. Witness cautioned persons not to handle the gun, and at night he put it in a room, and between two bed-ticks, and he was confident that no one handled it, except in his presence until the two empty shells were taken out of it. The reports of the two shots first fired resembled those of a shot gun, as they were different from those subsequently fired. On his cross-examination, the witness said he could not see who did the firing, on account of a room on the end of the gallery obstructing his view.

James Townsend testified that he was not at his home when the deceased was killed, but returned there shortly after that occurrence. Witness asked defendant Nash if he had suffered any damage in the affray, and Nash replied "Only this," pointing to the sleeve of his coat, in which the witness then saw there were a half dozen or more holes, as if made by shot.

In rebuttal, the State examined W. G. Miller, who testified that he was county surveyor of Bastrop county, and, about two years ago, had received a letter from the deceased's father, requesting him to bring his chain and compass to Townsend's, where the deceased was killed. The witness went, and, on the grounds, found not only the writer of the letter, but the then prosecuting attorney and Mr. William Paris. Mr. Paris took the witness to the spot where he said the wagon was standing when the deceased was shot. Witness measured the distance from that spot to the chimney at the east end of Townsend's house, and found it to be one hundred and seventy-two varas on a direct line. There were no trees intervening directly on the line, but there were ten or twelve trees at various distances from each other and from three to seven feet distant from the direct line.

*G. W. Jones* and *J. D. Sayers,* for the appellants, filed an able brief and argument, reviewing the evidence, the charge of the court below, and the authorities on which they relied for a reversal.

*J. H. Burts,* Assistant Attorney General, for the State: 1. The first assignment of error is not tenable. The testimony of W.

H. Coulson, to the effect that he supposed that appellant Cartwright was a deputy sheriff, was irrelevant, and not admissible. Cartwright knew, himself, that he was not a deputy sheriff, and if he took extraordinary process to serve, without being an officer, he did so at his peril; and if appellant Nash accompanied him to serve such process, he did so at his peril. The testimony offered and excluded did not tend to show that either of the appellants believed Cartwright to be an officer clothed with authority to execute the process, and there was nothing in the testimony to make it admissible. (*Staples* v. *The State*, decided at this term, and authorities therein cited, *ante.*, p. 136.)

2. The second assignment of error, viz, "The court erred in not charging the jury the law of self-defense," is not tenable, and is not sustained by the record. The court states to the jury, viz: "Upon self-defense or justifiable homicide, you are charged that any party who is so attacked as reasonably to produce a fear or expectation of death or some serious bodily harm, the party so attacked is justifiable in taking the life of the party so attacking." This was all that the law would justify the court, on the facts, in charging on this point. And this court will note that the charge was not excepted to at the time it was given, nor were additional charges asked by appellant. And it was neither made a ground for new trial, nor was it calculated to injure the rights of appellants. (Code Crim. Proc., Art. 685; *Maddox* v. *The State*, 12 Texas Ct. App., 429.)

3. The third assignment of error is not tenable, viz: That the court erred in the following portion of its charge, to wit: "You are charged that any attempt to execute any writ or process whereby property is to be seized by persons not authorized to execute such process is trespass. There is no evidence before you that Dave Cartwright is an officer authorized to execute such process. A constable cannot confer such authority upon any person, nor can any magistrate, except in the mode pointed out by law." This charge was not excepted to when given. But it is correct throughout. There is but one mode of conferring authority on a private person to execute process from a magistrate's court, and that must be upon a person of good character in an emergency. (Rev. Stats., Art. 1571.) If executed by an unauthorized person it is a trespass, as charged by the court. (*Erwin et al.* v. *Bowman*, 51 Texas, 513.)

There was no evidence before the jury that Cartwright was an officer authorized to execute such process, and it was proper

for the court to tell them so.   "It is the province of the judge to determine when there is or is not any evidence as to a certain fact." (*Burrell et al.* v. *The State,* 18 Texas, 713.)

Our Supreme court has always held that where there was no evidence to a given point, the court might so say to the jury. (*Parker* v. *Leman,* 10 Texas, 716; *Bond* v. *Mallow,* 17 Texas, 636.) These are civil cases, but there is no reason why the rule should not apply in criminal cases, as was held in *Burrell* v. *The State,* above cited.

But the charge was not excepted to when given, and being objected to for the first time on the motion for a new trial, and not being calculated to injure the rights of appellants, it will not be revised by this court; and thus this assignment is disposed of. (*Grant* v. *The State,* 2 Texas Ct. App., 167; *Maddox* v. *The State,* 12 Texas Ct. App., 429.)

4.   The fourth assignment of error is not tenable, which is that the court erred in the following portion of its charge:   "If you believe from the evidence that the defendant Dave Cartwright, accompanied by the defendant John Nash, if acting with him, were armed, and did undertake to seize, by virtue of a writ of sequestration, a gun in the possession of B. F. Davis, then B. F. Davis had the right to resist such seizure, and using force enough to prevent it; and if you further believe these defendants, being armed, did by their conduct induce the said B. F. Davis to believe his property was to be taken, or to kill him, then the said B. F. Davis would have been justifiable in taking the life of the defendants; and if you believe these defendants were placed under the necessity of taking the life of said B. F. Davis under such circumstances as these, and did so kill him, then they are not justifiable, but would be guilty of murder."

This paragraph of the charge, taken in connection with other parts of the charge, and in view of the evidence, is correct. The parties, without any legal authority, with drawn six shooters, assailed deceased on the highway, for the purpose of forcibly taking from him his property, which, according to the testimony of Horace Nash, was rightfully in his possession, and ordered him to "hold up" for that purpose. They were not justified in this. They were trespassers. (*Ross* v. *The State,* 10 Texas Ct. App., 455; *Erwin et al.* v. *Bowman,* 51 Texas, 573.) They were wrongdoers. (*Staples* v. *The State, ante,* p. 136.) Deceased had the right to defend his property and his person to the extent of slaying his pursuing assailants, and it was proper for the court

so to instruct the jury. (Penal Code, Arts. 572, 573, 574, 575.) The remaining portion of this paragraph of the charge correctly states the *rule*, where the accused, by his or their own wrong, bring about the necessity for taking life. (*Gilleland* v. *The State*, 44 Texas, 358.)

5.    The fifth assignment of error is not well taken; which is that the court erred in the following portions of its charge: "If you believe these defendants, acting together, without authority of law, to execute a writ of sequestration, were intending to seize the property of B. F. Davis in the execution of said writ, and if you further believe, though armed, they made no demonstration thereof, nor performed any act to indicate they intended to use any arms to secure possession of the property, nor to do any bodily harm to the possessor, then, if the said B. F. Davis, in resisting such seizure, used more force than was necessary, and resorted to a greater violence than necessary, and by such violence and use of a deadly weapon threatened the life of the defendants, or serious bodily harm, the defendants under such circumstances would not be justifiable in taking the life of B. F. Davis, but would be guilty of manslaughter."

This paragraph of the charge, if not critically correct, in view of the evidence, inured to the benefit of appellants, and of it they ought not to be heard to complain; and the cause on that account should not be reversed. (*Jenkins* v. *The State*, 1 Texas Ct. App., 346.) The charge in this respect, however, was in accordance with law. (Penal Code, Art. 597, subd. 2.) But, again, the charge was not excepted to when given, and was not calculated to injure the rights of appellants. (Code Crim. Proc., Art. 685; *Maddox* v. *The State*, 12 Texas Ct. App., 429.)

6. The sixth assignment of error is untenable. It is: "The testimony does not support the verdict in this: 1. There is no evidence whatever that the defendants or either of them ever attempted to seize the gun or to execute the writ of sequestration. 2. There is no evidence going to show that the defendants or either of them made an assault, or indicated an intention to assault B. F. Davis before the said Davis fired upon them with his gun."

The record contradicts this assignment in both of the stated particulars. It was proved that appellants, without authority, took the writ in McDade, and followed deceased with the intention of seizing the gun; that they pursued and overtook deceased on the highway, and with drawn pistols galloped or loped up to

him and commanded him to "hold up;" which was of itself an assault with deadly weapons. (Penal Code, Arts. 484, 485, 496, subd. 8, 9.)

7. The seventh assignment, which is "the court erred in overruling defendants' motion for a new trial," is not tenable. All points raised by this assignment have been discussed and disposed of. This motion was correctly overruled.

8. The first special assignment made for appellant Nash is untenable; which is: "There is no evidence going to show that he knew his co-defendant did not have the authority to summon him to assist in the execution of the writ of sequestration." It was his duty to know that his co-defendant had the authority to execute the writ. But he has no cause for complaint, for the court fairly submitted to the jury the issue as to whether or not he knew that Cartwright had authority to execute the writ, and the question as to whether or not he engaged in the difficulty. There was evidence that he had his pistol drawn when first noticed in the difficulty.

HURT, JUDGE. Cartwright and Nash were convicted of the murder of B. F. Davis. The verdict was for murder of the second degree, the punishment being fixed at six years confinement in the penitentiary. It being the duty of the court to charge the law upon every phase of the case presented by the evidence, and to abstain from charging upon theories not supported by evidence, the appellants insist that this rule has been violated to their injury, and ask a reversal of the case because of this error.

Under the facts, or the different phases of the facts, of this case, is the charge obnoxious to this objection? A detailed account of the facts immediately attending the homicide is, by W. R. Kelton and J. H. Tanner, given as follows:

By W. R. Kelton (a witness for the defendants): Was standing upon a scaffold, about breast high, engaged in putting up a chimney on the east end of Townsend's house, about fifty yards from where the shooting of the deceased took place. I first heard one of the parties on horseback say, either "hold up" or "do not shoot," which I do not remember. Just at that moment I saw the deceased on the wagon driven by Paris, with a shot gun elevated, and saw him shoot twice, first in the direction of the man to the rear of the wagon and then in the direction of the man on the right of the wagon; then I heard other firing from what I judged to be pistols, as the reports were different

from the two shots first fired; am sure the deceased fired two shots first and that there were no shots fired before the deceased fired; could see the deceased plainly from where I stood upon the scaffold; saw Paris as he took the gun out of the wagon after the firing took place; examined the gun, but did not take the hulls out, but saw they had been snapped or exploded freshly; there must have been five or six or seven shots altogether fired; saw nobody but the deceased shoot.

By J. H. Tanner (a witness for defendants): Was sitting on the gallery when the shooting in which Davis was killed occurred; my attention was first called by hearing two shots fired. I first supposed that they were from the shot gun of an old negro, who was in the habit of hunting near, but directly other shots were fired. I immediately went down to where the firing occurred; the deceased was humped over in the wagon; saw Paris take a shot gun up as I went toward the wagon; took hold of it and it appeared to have been freshly fired; examined the gun and saw that the cartridges had been fired or snapped; Cartwright told me not to let anyone take the cartridges out of the gun. Some time during the next day several of us examined the gun and found two empty shells in the gun, when I put it in a room at night and between two bed ticks, and am confident that no one handled it, except in my presence, until the two empty shells were taken out. The sounds of the two shots fired first when the killing took place resembled those of a shot gun, as they were different from those afterwards fired; could not see who did the firing, as there was a room on the east end of the gallery, and between the place where the firing occurred.

The facts relied upon by the State are, in substance, these: Cartwright and Nash, neither being an officer, left McDade with a writ of sequestration against the deceased for a shot gun. The deceased, B. F. Davis, had left McDade with said gun, going in the direction of Bastrop, and within a half mile of McDade he overtook the witness Paris, who was driving a wagon drawn by four mules. Davis got in the wagon, and when they had traveled about three miles, and were within about one hundred yards of the house of James Townsend, Cartwright and Nash rode up from the direction of McDade, in a gallop. Cartwright came up on the right hand side of the wagon; Nash was to the rear of the wagon. Cartwright said, "hold up there." Cartwright had a pistol in his hand. Paris then looked around to stop his mules, and the shooting commenced. Looking back he saw Cartwright.

shoot once. There had been shots fired before he looked around; * * * several shots were fired from behind his back. Witness Paris did not see Nash until the shooting was over. Nash then had a pistol in his hand. Witness thinks there were from three to five shots fired—probably more. Two of the shots hit the end of the wagon bed, one went through his clothing, and another hit one of the mules. Davis was killed in this affray, being shot twice in the body.

The witness Paris, upon being cross-examined, swore that "he did not distinguish any difference in the sounds of the different shots;" but his evidence taken before the examining court being read to him, in which it appeared that he swore "that there were sounds that seemed different shots from the pistol," he stated that he would adhere to what he said in his statement made before the examining court, as it was the next day after the killing, when the facts were fresh in his mind, and his recollection was better than now.

This statement, we think, will suffice to present the main facts in the case, as well as the issues to be passed upon by the jury.

After charging the law applicable to murder of both degrees, the learned judge below, upon the issue of justifiable homicide, submitted to the jury these instructions:

"Upon self-defense or justifiable homicide, you are charged that any party who is so attacked as to reasonably produce a fear or expectation of death or serious bodily harm, the party so attacked is justifiable in taking the life of the party so attacking.

"In this connection, you are further charged that whenever a party has produced by his own wrong acts any necessity to take human life in order to preserve his own life, he can not be excused or justified.

"You are charged that any attempt to execute any writ or process whereby property is to be seized, by persons not authorized to execute such process, is trespass.

"If you believe from the evidence that the defendant Dave Cartwright, accompanied by the defendant John Nash, if acting with him, were armed, and did undertake to seize, by virtue of a writ of sequestration, a gun in the possession of B. F. Davis, then B. F. Davis had the right to resist such seizure, and using force enough to prevent it. And if you further believe these defendants, being armed, did by their conduct induce the said B. F. Davis to believe that his property was to be taken, or to

F1

kill him, then the said B. F. Davis would have been justifiable in taking the life of the defendants. And if you believe these defendants were placed under the necessity of taking the life of said B. F. Davis under such circumstances as these, and did so kill him, then they are not justifiable, but would be guilty of murder.

"If you believe these defendants, acting together without authority of law to execute a writ of sequestration, were intending to seize the property of B. F. Davis in the execution of said writ, and if you further believe, though armed, they made no demonstration thereof, nor performed any act to indicate they intended to use any arms to secure possession of the property, nor to do any bodily harm to the possessor, then, if the said B. F. Davis, in resisting such seizure, used more force than was necessary and resorted to a greater violence than necessary, and by such violence and use of a deadly weapon threatened the life of the defendants, or serious bodily harm, the defendants, under such circumstances, would not be justifiable in taking the life of the said B. F. Davis, but would be guilty of manslaughter.

"If you believe that Dave Cartwright did attempt to seize the property of B. F. Davis under a writ of sequestration, and if you believe John Nash was present, and honestly believe said Cartwright had authority to execute said process, and if in the proper execution thereof the said Nash's life or that of Cartwright became reasonably threatened, or some serious bodily harm to either, did shoot at said B. F. Davis to avert and prevent such threatened danger to himself or to Dave Cartwright, or if you believe the said Nash was present, yet if he did not engage therein, you will acquit him."

The first charge cited enunciates a proposition to which we cannot assent. This is the proposition: That whenever a party has produced by his own wrong acts any necessity to take human life in order to preserve his own life, he cannot be excused or justified.

What character of wrong acts must produce the necessity to take life? Suppose the wrong acts were not calculated to produce the necessity, but did have this effect? Again, suppose the wrong acts were not intended to "produce the necessity" by the wrong-doer? Would the party guilty of the "wrong acts" be guilty of culpable homicide, who, to save his own life, takes the life of another under the supposed cases?

Just here it is necessary for us to consider the nature or qual-

ity of the act, the doing of which will so far abridge one's right of self-defense that if he kill another, although to save himself from death or great bodily harm, he will yet be guilty of a felonious homicide in some of its degrees. It would be quite difficult to lay down a general rule by which all wrongful acts could be tested and adjudged sufficient or not sufficient to deprive one of the complete right of self-defense. This we will not attempt, but will at present confine ourselves to the conclusions reached by our examinations of quite a number of cases. From these cases we conclude that the doing of the following acts is held so far to abridge a man's right of defense that if he therefore kill another he cannot be acquitted of all crime:

1. Using provoking language or resorting to any other device in order to get another to commence an assault so as to have a pretext for taking his life, or to have a pretext for inflicting on him bodily harm. (*Stewart* v. *The State,* 1 Ohio, 66; *Adams* v. *The People,* 47 Ill., 376.)

2. Provoking another for the purpose of bringing him into a quarrel, so that an affray be caused. (Selfridge's case, H. & T. on Self-Defense, p. 24.) But in Selfridge's case, though this proposition is stated generally, it is most clearly stated that no words nor libelous publications, however aggravating, will deprive one of the right of defense if in consequence of the same he is attacked.

3. Agreeing with another to fight him with deadly weapons. (*State* v. *Hill,* 4 Dev. & Batt., 491.)

5. Going to the place where another is, with a deadly weapon, for the purpose of provoking a difficulty, or with the intent of having an affray. (*The State* v. *Neeley,* 20 Iowa, 108; *The State* v. *Benham,* 23 Iowa, 154; *Vader* v. *Commonwealth,* 12 Gratton, 717.)

The doing of the acts contained in the former illustrations will deprive the party of the right of a complete or full defense.

There is, however, another very important question presented in the fifth proposition. Suppose that a person should go armed to the place where another is, intending to provoke a difficulty, but says nor does anything to the other at all, or says nor does anything to the other tending to show that his purpose was to provoke him to a difficulty. Will the intent with which he went, though nothing said or done by him was intended or calculated to provoke the other, deprive him of the right of self-

defense? By consulting the cases we will find that there was some act or word done or said tending to provoke the other.

Let us take the Neeley case. Cassady, the party killed, and Neeley, lived on adjoining farms, the former with his mother. The parties were. not on friendly terms. The fences around Cassady's farm were bad. Neeley's stock broke through occasionally and were injured by dogs or otherwise. On the morning of the day of the homicide, Neeley, believing that his hogs were being injured by dogs, went with his gun to the field where some children belonging to the Cassady family were, and shot the dogs. After this and late in the afternoon, hogs were again heard in the field, apparently being worried by dogs. Neeley hurried there with his gun, and pursued the sister of Cassady and the children through the field in the direction of the house. On their return home, upon telling their story, Cassady, with his mother and sister, left the house and went down to the field, having with him a small rifle. Neeley in the meantime had left the field and gone in an opposite direction from the other parties, perhaps a distance of sixty or seventy rods. The other parties were passing along a path inside of the farm. At this time, some of the witnesses say that a shot was fired in the field, while others heard nothing of it. Neeley, either because he heard a shot or saw Cassady and his mother and sister, or for some other cause not developed, turned and walked back to where they were. When within a few feet of them, and after a few words had passed between them, the prisoner shot and killed Cassady.

According to the testimony of some of the witnesses, who were some distance off, there was first heard the sharp crack of a rifle, then, instantly, the hoarser sound of a shot gun, and then, almost as quick, a third shot like the second. Neeley fired a small double barreled shot gun; and the third shot was at a dog, according to some of the witnesses, and, according to others, at Mrs. Cassady. The theory of the defense was justifiable homicide.

Under this state of facts, the court charged the jury that "If the jury believed, from the evidence, that the defendant brought on the difficulty, by voluntarily returning to the vicinity of the deceased with a deadly weapon, for the purpose of provoking a difficulty, his plea of self-defense would be of no avail, and in that case it would make no difference who fired the first shot." Under the surrounding facts of this case, this charge was cor-

rect. Neeley had shot the dog; had chased, but a short time before the killing, with a gun, Cassady's sister and the children from the field; and when he approached them the last time, he did not walk in an ordinary gait, but "approached rapidly." These acts, leaving out of the case what was said in the words which passed between him and Cassady just before the killing, were not only intended, but were evidently calculated to provoke a difficulty; and Neeley could but have known that an affray would be the result when he rapidly returned with his gun to where these folks were.

Benham's case was as follows: Shepard, the deceased, was at the creek, loading sand. Benham came up on the opposite side with a gun, and commenced talking about cattle. He said cattle were troubling him, and if they continued he would dog them. Shepard told him to dog them as much as he pleased, but not to cross the creek and drive them off with a horse. Benham told him that he, Shepard, had shot cattle, and now it was his turn. Shepard told him he had shot no cattle, and if he told him so again he would whip him. Benham repeated that he had shot cattle, and he, Benham would shoot too; and Shepard started across the creek towards him. As he was almost across the creek Benham met him with a gun, and pointed it at his, Shepard's breast. Shepard sprang out of the water, took hold of the gun to push it down, and it was discharged into his thigh. This statement is that which was relied upon for conviction.

In commenting upon the case, Judge Dillon makes this remark, bearing upon the question in hand: "Nor can the defendant get the benefit of the plea of self-defense if he sought the deceased with a view to provoke a difficulty, or to bring on a quarrel;" and he cites Neeley's case in support.

Here again we find that there was also something else besides going to the place where the person was, with a deadly weapon, for the purpose of provoking a difficulty. Benham evidently desired a difficulty, and did that which was calculated to produce one. Hence his acts, coupled with what he said to Shepard, were very properly held to be such provocation as would, when forced to save his life, defeat his right to a perfect defense to the homicide committed under such circumstances. But Neeley's case furnishes no support to the latter part of Judge Dillon's proposition, to wit: "or to bring on a quarrel." This proposition is in direct conflict with Selfridge's case, and if it has

any support from any source we have not been able to find it. As stated, we do not believe it sound. We are of the opinion that Judge Dillon had reference to the principle enunciated in our first proposition, namely, "using provoking language," or resorting to any other device, in order to get another to commence an assault so as to have a pretext for taking his life. This principle we think sound and just. He who resorts to such means, or to any means, to provoke a difficulty, with a view to take the life of his victim, is not only guilty of murder, but murder of the first degree.

Can this be said of a person who merely goes to another with intent to provoke a quarrel? We think not, unless the ultimate object or intent is to take the life of the party, or commit a felonious assault in some of its grades. In Selfridge's case it was held that: "No words spoken, or libelous publications, however aggravating, will compromit his complete right of defense." This should be modified; for we have seen that if the words were spoken with the intent to provoke an assault for the purpose of having a pretext for taking his life, he would be guilty of murder. There is a vast difference between this proposition and that stated by Judge Dillon, to wit, "to bring on a quarrel." While we might cite a hundred cases bearing upon this subject, but little could be learned of value so long as the principle which underlies the whole question is not correctly understood.

What then is the principle? In Broom's Legal Maxims, page 255, it is said: "A man may not take advantage of his own wrong to gain a favorable interpretation of the law. He seeks the law in vain who offends against it." It is upon the plain principle, said Wright, Judge, in Neeley's case, "that one can not willingly and knowingly bring upon himself the very necessity which he sets up for his defense." It would follow, therefore, that the conduct of the party must show that he knowingly and willingly used language, or did acts which might reasonably lead to an affray or a deadly conflict; and that something besides merely going to the place where a person slain is, with a deadly weapon, for the purpose of provoking a difficulty, or with the intent of having an affray, is required in order to constitute such wrongful act. But it is not necessary that the additional acts or words should be done or said at the time of the homicide. (Neeley's case.) The former conduct of the defendant towards the party slain, with all of the attending circumstances occurring before, and in connection with the fact that he went to the

person slain, and his language and bearing toward him at the time of the homicide, may, and frequently do, constitute that character of provocation which estops defendant from pleading the necessity which otherwise could be interposed.

But, reduced to the exact proportion of this case, the question is this: Suppose that a party without authority, not being an officer, rides rapidly up to another, with pistol in hand, intending to take his gun or other property by virtue of a writ, but says nothing, nor does any act, tending to show an immediate intention to execute the writ; will he be denied the right of defense, if he kill to save his own life? Will the fact that he thus approached the other, with pistol in hand, compromit his right of complete defense? He is armed, has the intent, and rapidly approaches, but says nothing nor does any acts tending to show the immediate intention to consummate the wrongful act.

Bearing directly upon this question, Mr. Bishop says: "Between preparation for the attempt and the attempt itself there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense. Attempt is the direct movement towards the commission, after the preparation is made. To illustrate: A party may purchase and load a gun, with the declared intention to shoot his neighbor, but, until some movement is made to use the weapon upon the person of his intended victim, there is only preparation and not an attempt." (Bish. Crim. Law, vol. 1, 764.)

"The movement to use the weapon upon the victim need not be the last proximate act prior to the consummation of the offense. If it be the first of a series of steps towards the execution—a commencement of execution—it will suffice." (*Id.*)

Now it must be borne in mind that there was no prior conduct or previous difficulties or ill feeling between any of these parties, connecting itself with the acts immediately attending the homicide, as was the case in the Nceley case. Hence, can the acts of these defendants at the time of the homicide, without color from any other source, be held such provocation as will deprive them of the right of defense? Are they such acts (standing alone) as will in law have this terrible effect? Are defendants or either of them by these acts to be adjudged felons, although they took the life of Davis to save their own? We think not.

As before intimated, immediate acts must condemn; for there is a perfect want of any other acts, malice or bad blood. In fact, it was the merest accident that Cartwright was sent with

the writ, or that Nash was summoned by him. Davis did not know that they had the writ, but from his position in the wagon and the manner in which he constantly held his gun, he was evidently expecting some one in pursuit. And just here it may be observed that his attitude in the wagon, and the position in which he held the gun, may very satisfactorily account for Cartright having out his pistol.

There being no such provocation as would compromit defendants' right of defense, and there being no attempt to execute the writ, was it proper for the learned judge below to assume in his charge these phases of the case? We are clearly of the opinion that it was not. The evident effect of such a course is to impress the jury with the belief that the acts of defendants were such provocation, and also that their acts constituted an attempt to seize his gun. With such belief the jury could not have consistently acquitted defendants or either of them. If these defendants, whether officers or not, charged down upon Davis and commenced firing upon him, they are guilty of murder at least; and if the jury so believed, they should have convicted them of such offense. But, on the other hand, if Davis commenced the battle, and defendants fired in their complete self-defense, they should not be convicted, and the jury should have been told so, untrammeled with any such condition as was done in this case.

We do not think that the other assignments relied upon for a reversal are well taken. For the errors in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 23, 1883.